# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

## MONROE DIVISION

ROBERT PAUL TAYLOR        CIV. ACTION NO. 3:22-05210 SEC. P

VERSUS        JUDGE DAVID C. JOSEPH

RICKY JONES, ET AL.        MAG. JUDGE KAYLA D. MCCLUSKY

## REPORT AND RECOMMENDATION

By order of the District Court,[1] pursuant to 28 U.S.C. § 636(b)(1)(B), the undersigned Magistrate Judge held an evidentiary hearing on April 28, 2025, in accordance with *Flowers v. Phelps*, 956 F.2d 488 (5th Cir.), *modified in part on other grounds*, 964 F.2d 400 (5th Cir. 1992). Following the hearing, and for reasons set forth below, IT IS RECOMMENDED that Plaintiff Robert Paul Taylor's pending motion to confirm default judgment [doc. # 88] against Defendants Roosevelt England (sued as, "Robert England" or "R. England") and Marzavian Washington (sued as, "Corporal Washington" or "Cpl Washington") be DENIED, and, instead, that the Clerk of Court's entries of default against said Defendants be set aside.   IT IS FURTHER RECOMMENDED that the District Court enter judgment in favor of all remaining Defendants, Sheriff Ricky Jones, Pat W. Smith, Nolan Bass, Roosevelt England (sued as, "Robert England" or "R. England"), Marzavian Washington (sued as, "Corporal Washington" or "Cpl Washington"), plus their unknown "Insurer," and against Plaintiff Robert Paul Taylor, DISMISSING his claims with prejudice and at his cost.

---

[1] January 9, 2025 Judgment [doc. # 76].

## Background

### I.     Taylor's *Pro Se*[2] Litigation History in the Louisiana Federal Courts[3]

On August 4, 2014, Robert Paul Taylor ("Taylor") filed suit in the United States District Court for the Western District of Louisiana ("WDLA") against the New Orleans Police Department ("NOPD") and various NOPD officers for beating and kicking him unconscious during a traffic stop, which left Taylor with facial fractures, a broken left arm, and a cyst on his testicle.  *See Taylor v. Stalbert, et al.*, Civ. Action No. 14-2432 (W.D. La.) ("*Stalbert Suit*").[4]

On August 27, 2014, Taylor filed a separate suit in the EDLA against the NOPD, and various NOPD officers, stemming from the same incident that formed the basis for the earlier filed *Stalbert Suit*.  *See Taylor v. New Orleans Police Department, et al.*, Civ. Action No. 14-1972 (E.D. La.) ("*NOPD* Suit").

On November 17, 2014, Magistrate Judge Hornsby transferred the *Stalbert* Suit to the

---

[2] Court records reflect that, in October 2004, an individual named Robert Paul Taylor, who was incarcerated at the Calcasieu Parish Correctional Center ("CCC"), filed suit against various prison officials for injuries sustained when a deputy entered the plaintiff's cell and slammed his head against the wall and then beat him unconscious.  *Taylor v. Lundy*, Civ. Action No. 04-2219 (W.D. La.) ("*CCC Suit*").   However, the plaintiff in the *CCC Suit* was represented by counsel, and, thus, it cannot be confirmed that he is the same Robert Paul Taylor who is the plaintiff in this and other cases.   In due course, the parties settled the *CCC Suit,* and it was dismissed on plaintiff's motion.  *See CCC Suit.*

[3] "Judicial notice may be taken of matters of public record."  *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 735 (5th Cir. 2019) (citations omitted).   Thus, because court pleadings in other cases constitute public records, a court may take judicial notice of them.  *Murchison Capital Partners, L.P. v. Nuance Commc'ns, Inc.*, 625 Fed. App'x. 617, 618 n.1 (5th Cir. 2015) (citations omitted).   Furthermore, a court may take judicial notice on its own.   FED. R. EVID. 201(c).

[4] In the *Stalbert Suit*, Taylor alleged that he was also known as, "Richard E. Italiano."

Eastern District of Louisiana ("EDLA") where the court dismissed the case without prejudice, as duplicative of the *NOPD Suit*. *See Stalbert Suit* and *Taylor v. Stalbert, et al.*, Civ. Action No. 14-2657 (E.D. La.).

For roughly the next two years, Taylor litigated the *NOPD Suit* until the parties settled in June 2016. *NOPD Suit*, June 7, 2016 Order Dismissing Case [doc. # 154]. Over one year later, on August 9, 2017, Taylor filed a Rule 60(b) motion to vacate the prior order of dismissal in the *NOPD Suit* on account of alleged misinformation and deception by defendants and/or their attorneys. *NOPD Suit* [doc. # 169]. Magistrate Judge Knowles denied the motion, explaining that,

> "[t]here must be an end to litigation at some point." *Smith v. Missouri Pacific Railroad Co.*, 615 F.2d 683, 685 (5th Cir. 1980). Allowing plaintiff to change his mind at this point and revive this litigation upon nothing more than his conclusory allegations and aspersions "would defeat both the aim of finality and the integrity of the settlement process in civil rights actions."

*NOPD Suit* [doc. # 170].

Meanwhile, on July 7, 2017, Taylor filed a new civil rights complaint against various managing entities and officials associated with the Winn Correctional Center ("WCC") for their failure to provide him with constitutionally adequate medical care for injuries caused by the officers in the *NOPD Suit*. *See Taylor v. LaSalle Management Co., et al.*, Civ. Action No. 17-0882 (W.D. La.) ("*WCC Suit*"). For well over the next three years, Taylor litigated the *WCC Suit* until the parties settled the matter in April 2021. (April 21, 2021 Notice of Settlement, *WCC Suit* [doc. # 293]).

Five months later, on September 14, 2021, Taylor filed yet another civil rights complaint, this time against the Bayou Correctional Center ("BCC") and various prison officials for injuries he sustained when a prison guard slammed his head into a cement wall and then slammed him

"senseless" to the concrete floor. *See Taylor v. Bayou Correctional Center*, Civ. Action No. 21-3295 (W.D. La.) ("*BCC Suit*"). Thereafter, another prison official kicked Taylor in the face, head, and neck. *Id*. Taylor claimed resulting serious injuries to his head, neck, and right testicle. *Id*. In addition:

> Plaintiff claims that Batiste, Baldwin, and Coleman escorted him to the fourway cell, where "they" sprayed mace directly into his face. [doc. # 5-1, p. 12]. Plaintiff later claims, however, that it was Batiste who sprayed him with an "entire can of mace . . . as [Plaintiff] laid on the floor where they viciously threw" him. *Id*. at 21. Plaintiff remained in the cell for seven days (until September 23, 2020) without receiving a shower, clean clothes, decontamination, or other medical care. *Id*. at 12, 13. During those seven days, he lost consciousness, contracted an infection, and suffered from dehydration and stomach swelling or cramping. [doc. # 9-3, p. 2].

> Plaintiff claims that Sullivan, Bonney, Batiste, Baldwin, and Coleman conspired to use the fourway cell, which lacks cameras, to "cover-up the responsible parties for [his] tremendous suffering . . . ." [doc. # 5-1, pp. 22-23].

*BCC Suit*, Dec. 7, 2021 R&R [doc. # 11]. The Court observes that, although Taylor named a "Corporal Washington" in the *BCC Suit*, he did not set forth any facts against him and did not object to the court's dismissal of his claims against Washington for failure to state a claim for relief. *Id*. and Dec. 27, 2021 Judgment [doc. # 13].

As with his other lawsuits, Taylor eventually settled the *BCC Suit*, and the court dismissed the case on June 23, 2022, pursuant to the parties' consent motion. *BCC Suit* [doc. #s 55-56].

Taylor commenced the instant litigation two months later.

## II.    Procedural History of Taylor's Present Suit

On or about August 31, 2022, Taylor, who, during the relevant period, was incarcerated initially at the BCC and later transferred to the Tensas Parish Detention Center ("TPDC"), filed the instant, *in forma pauperis* complaint to vindicate his civil rights under 42 U.S.C. § 1983. *See* Amend. Compl. & 2nd Amend. Compl [doc. #s 12, 14]. He named a host of Defendants,

including Sheriff Ricky Jones, City of St. Joseph, the TPDC, Warden Pat W. Smith, Assistant Warden Nolan Bass, Dr. Janna Carpenter Chauvin, Nurse Frazier, Nurse Harvey, Roosevelt England (sued as, "Robert England" or "R. England") (hereinafter, "England"), Marzavian Washington (sued as, "Corporal Washington") (hereinafter, "Washington"), an unidentified insurance company, and Nurse Whitney. *Id*.

On April 5, 2023, the undersigned conducted an initial review of Taylor's operative pleadings, recommending of various claims and parties, but retention of the following claims:

> (1) that Dr. Janna Carpenter Chauvin canceled Plaintiff's prescribed or recommended medications in "early July 2020" and later at TPDC;
>
> (2) (i) that Warden Pat W. Smith, Dr. Chauvin, Nurse Frazier, and Nurse Harvey canceled Plaintiff's "scrotal scopic work-up" scheduled for August 31, 2021, and (ii) that Smith, Frazier, Harvey, and Warden Bass refused to transport him to University Health Shreveport on August 31, 2021, delaying his appointment until November 31, [sic] 2021;
>
> (3) that on November 14, 2021, Defendants England and Washington failed to protect Plaintiff from other attacking inmates, utilized excessive force, failed to provide constitutionally adequate medical care, and failed to provide decontamination measures after spraying him with mace;
>
> (4) that Warden Smith, Warden Bass, and Sheriff Jones, in their individual capacities, failed to protect Plaintiff from England and Washington's uses of force on November 31, [sic] 2021;
>
> (5) that England and Washington committed tortious acts under state law, including battery, excessive force, and failure to protect;
>
> (6) that Sheriff Jones is vicariously liable for Washington and England's alleged tortious conduct under state law; and
>
> (7) Plaintiff's direct action against the unidentified insurance company.

(Report and Recommendation ("R&R") [doc. # 16]).

The undersigned summarized Taylor's allegations pertaining to his remaining claims, as

follows,

> [Taylor] claims that Warden Pat W. Smith, Dr. Janna Carpenter Chauvin, Nurse Frazier, and Nurse Harvey canceled his "scrotal scopic work-up[.]"   [doc. # 12, p. 2].   [Taylor] claims similarly that Smith, Frazier, Harvey, and Bass "all opined that [he] was malingering" and refused to transport him to University Health Shreveport on August 31, 2021.   [doc. # 12, pp. 4- 5].   His appointment was re-scheduled for November, 2021.   [doc. # 14, p. 4].

> On November 14, 2021, three pre-trial inmates in B-Tier stabbed [Taylor] in the neck and hit him with a metal lock. [doc. # 12, p. 7].   He bled profusely.   *Id*.   He "believes the beating . . . was an arrangement [the inmates] made with Officers England and Washington who were always being cool with these three inmates." [doc. # 14, p. 7].

> [Taylor] claims that England and Washington failed to protect him, waiting nine minutes before entering B-Tier. [doc. #s 12, pp. 7, 10; 14, p. 6].   England and Washington were "monitoring the problematic inmates for approximately nine minutes, waiting that long before they breached the B-tier locked door and entered the tier coming exactly to" [Taylor]'s location. [doc. # 14, p. 6].   [Taylor] was bleeding, disoriented, and unstable.   *Id*.

> [Taylor] claims that England and Washington then used excessive force on him. [doc. # 12, p. 7].   England hit him in the forehead above his right eye and sprayed mace in his face.   *Id*.   Washington slammed him against a metal door, pushing him inside Cell 16.   *Id.* at 7-8.   He fell against a cement floor.   *Id*. at 8.

> [Taylor] claims that England and Washington did not provide any decontamination measures after spraying him with mace.   *Id*.   He could "barely breathe from the mace[.]"   *Id*. He was placed in a cell which lacked a shower, and he was not given any new clothes.   [doc. # 14, p. 7].   He also faults England for failing to provide any medical care after the inmates beat him.   [doc. #s 12, p. 8; 14, pp. 6-7].

> [Taylor] claims that Warden Smith, Warden Bass, and Sheriff Jones failed to protect him from England and Washington, alleging that he told them in October 2021 that England and Washington "were sadistic and violent and had hurt [him] at BCC on [February 26, 2021, and March 15, 2021]."   *Id*.   at 8-9.   He "wrote a letter to Sheriff Jones himself complaining about R. England and Washington . . . ."   *Id*. at 10.   He told Smith and Bass that he feared for his safety.   [doc. # 14, pp. 5, 9].   He "strenuously" reported that England and Washington previously assaulted him. [doc. # 12, p. 8].   He claims that Smith and Bass did "absolutely nothing[.]"   [doc. # 14, pp. 5, 9].   He suggests that he later informed Smith that England and Washington had entered his cell, threatened him because of his previous lawsuit against Washington, and stated that they were "going to make [his] life doing time

harder than ever before." *Id*. at 6.

(R&R [doc. # 75]) (quoting R&R [doc. # 16])).    On April 20, 2023, the District Court adopted the R&R and entered a corresponding judgment.    (Judgment [doc. # 17]).

Meanwhile, on April 5, 2023, the undersigned ordered service upon the remaining Defendants.    *See* Service Order [doc. # 15].    On June 30, 2023, the U.S. Marshals Service ("USMS") perfected service on several Defendants.    *See* Returns of Service [doc. # 19].    On July 21, 2023, Defendants Sheriff Ricky Jones (hereinafter, "Sheriff Jones"), Pat W. Smith, Nolan Bass, and Nurse Harvey filed their responsive pleading.    (Answer [doc. # 21]).    Consequently, on February 8, 2024, the Court issued its initial scheduling order.    (Sched. Order [doc. # 50]).

However, Defendant Nurse Frazier, who was not served until later, filed a responsive pleading on February 29, 2024.    (Answer [doc. # 54]).    In light of Nurse Frazier's subsequent appearance in the case, the Court issued a superseding scheduling order on March 5, 2024, that harmonized deadlines in the case to include a July 3, 2024 deadline for the completion of discovery and an August 7, 2024 deadline for the parties to file either a motion for summary judgment or a statement of issues.    (Sched. Order [doc. # 55]).

Furthermore, because Defendants England and Washington no longer worked at the TPDC, the Court took additional steps to obtain valid addresses to secure proper service upon them.    *See* doc. #s 20, 27-30.    Thereafter, the USMS successfully served England and Washington on September 12, 2023.    *See* Returns of Service [doc. # 32].    Despite proper service, these Defendants failed to appear.    Accordingly, after prompting by the court, Taylor applied for and obtained entries of default against England and Washington on December 14, 2023.    *See* doc. #s 34, 38, 40, 42-43.[5]

---

[5] On January 19, 2024, Taylor filed a motion for default judgment against England and

Defendant Janna Chauvin also is no longer employed at the TPDC.    Despite efforts to obtain a forwarding address for Chauvin, neither the Court nor Taylor was able to discern a valid address.    Accordingly, on April 12, 2024, the undersigned recommended dismissal of Taylor's claims against Chauvin.    *See* April 12, 2024 R&R [doc. # 58].    On April 29, 2024, the District Court adopted the Report and Recommendation and dismissed Taylor's claims against Chauvin. (April 29, 2024, Judgment [doc. # 59]).

On August 7, 2024, Defendants Sheriff Jones, Pat W. Smith, Nolan Bass, Nurse Frazier, and Nurse Harvey (collectively, "Movants"), filed a motion for summary judgment seeking dismissal of Taylor's remaining claims against them.    [doc. # 64].    They argued that they were not responsible for the postponement of Taylor's urology appointment from August 31, 2021, to November 2021, and, in any event, Taylor was not substantially harmed by the delay.    They further argued that they could not be liable for any of the alleged actions by Defendants England and Washington on November 14, 2021, because England and Washington were not employed at the TPDC on that date.

The undersigned issued an R&R on December 17, 2024, finding, as to Taylor's claim pertaining to his postponed urology appointment, that,

> [b]ased on the evidence of record, no reasonable trier of fact could return a verdict in favor of Taylor finding that Warden Pat W. Smith, Nurse Frazier, Nurse Harvey, and Warden Bass were deliberately indifferent to a substantial risk of serious medical harm faced by Taylor as a result of a three-month postponement of his August 31, 2021 urology appointment.    Consequently, Defendants Smith, Frazier, Harvey, and Bass are entitled to summary judgment as to Taylor's inadequate medical care claim.

(R&R [doc. # 75]).[6]

---

Washington [doc. # 45], which the Court denied.    *See* doc. #s 56 & 57.

[6] Because the postponement of the August 31 urology appointment was the only remaining claim

As to the alleged November 14, 2021 incident, the undersigned was

> unable to conclude that the record is so overwhelming that no reasonable trier of fact could credit Taylor's representation that England and Washington were present and working on November 14, 2021. Taylor knew w[hat] England and Washington looked like because he had encountered them at the BCC before his transfer to the TPDC. Furthermore, it is possible that England and Washington were employed in another capacity on November 14, 2021, but still present at the TPDC on that date. In short, Taylor has created a genuine dispute of material fact regarding England and Washington's presence for the events that transpired on November 14, 2021, at the TPDC, which suffices to defeat the basis for Movants' summary judgment motion as to these claims.

*Id*.

On January 9, 2025, the District Court adopted the R&R and referred the matter to the undersigned to "conduct an evidentiary hearing pursuant to *Flowers v. Phelps*, 956 F.2d 488 (5th Cir.), *modified in part on other grounds*, 964 F.2d 400 (5th Cir. 1992), and submit a Report and Recommendation to the Court." (Judgment [doc. # 76]).

On January 15, 2025, the undersigned issued an order setting the case for an evidentiary hearing on April 28, 2025, which was intended to be a complete hearing of all witnesses and evidence to be presented by all parties of record, as to all remaining issues in the case. (Jan. 15, 2025 Order [doc. # 77]). The order recognized that Taylor was seeking $350,000 for some type of undesignated damages and $200,000 in punitive damages, stemming from the following remaining claims against the specified Defendants:

> (1) that on November 14, 2021, Defendants Roosevelt England ("England") and Marzavian Washington ("Washington") failed to protect Plaintiff from other attacking inmates, utilized excessive force, failed to provide constitutionally adequate medical care, and failed to provide decontamination measures after spraying him with mace;

> (2) that Warden Pat W. Smith, Warden Nolan Bass, and Sheriff Ricky Jones, in their

_____

against Nurses Frazier and Harvey, the dismissal of that claim resulted in their dismissal from the suit. *Id*., pg. 13, n.6.

9

individual capacities, failed to protect Plaintiff from England and Washington's uses of force on November 31, [sic] 2021;

(3) that England and Washington committed tortious acts under state law, including battery, excessive force, and failure to protect;

(4) that Sheriff Jones is vicariously liable for Washington and England's alleged tortious conduct under state law; and

(5) Plaintiff's direct action against an unidentified insurance company.

*Id. (*citing doc. #s 16-17, 56-59, 76-76). The order also included attachments with specific instructions explaining to Taylor how to obtain the attendance of witnesses at the hearing. [doc. # 77-2].

On April 4, 2025, Taylor filed the following motions: a motion for leave to amend complaint [doc. # 84], a motion for leave to bring in Defendants' insurer [doc. # 86]; and a motion for default judgment against Defendants England and Washington [doc. # 88].

On April 28, 2025, the undersigned held the scheduled evidentiary hearing that lasted seven and one-half hours-long and included testimony from Taylor and five witnesses he called. (Minutes [doc. # 91]). At the hearing, the Court received into evidence Taylor's medical records, x-rays of his head and spine, his TPDC inmate file and separation notices for Washington and England. (Pl. and Defs. Witness Lists [doc. #s 93-94]).

At the outset of the hearing, the Court denied Taylor's motions for leave to amend complaint [doc. # 84] and to bring in Defendants' alleged insurer, an interlocal risk management program [doc. # 86], not only because the motions were filed out of time and without good cause, but also because the proposed amendment/joinder was futile. *See* Minutes [doc. # 91]; *see also Taylor v. Bayou Corr. Ctr., LLC*, Civ. Action No. 21-3295, 2021 WL 6118739, at *18 (W.D. La. Dec. 7, 2021), *R&R adopted,* 2021 WL 6113413 (W.D. La. Dec. 27, 2021) (recognizing that

10

plaintiff, i.e., Taylor, did not have a direct action against an interlocal risk management agency).

The matter is now before the Court.

### **Hearing Testimony and Evidence**

At the hearing, the Court heard testimony from Taylor, Sheena Vige, Neil W. Fischer, Sherry Whittington, Nolan Bass, and Pat W. Smith.    The relevant, non-exhaustive testimony of each witness is summarized below.

**I.    Robert Paul Taylor**

Taylor's testimony generally was consistent with the allegations in his pleadings and prior representations to the Court.   He testified that England and Washington hurt him on three different occasions and at two different facilities.   England and Washington initially hurt Taylor when they violently yanked him out of a chair while he was talking to Nurse Chauvin at the BCC. They then locked him up for ten days, let him out, and then did it all over again.   This occurred in January and March 2021.

In March 2021, Taylor was transferred to the TPDC.   From March through September of that year, three pretrial detainees, Mize, Mark, and Pierce, terrorized the TPDC prison populace. In one of Taylor's written submissions to the Court, he stated that Mize, Mark, and Pierce severely beat, battered, and robbed him for the first time on June 8, 2021.   *See* Pl. Witness List, pgs. 25-26 [doc. # 82].

Taylor explained that, from August 29 through September 3, 2021, the TPDC was overflowing with inmates after Plaquemines Parish evacuated its prisoners because of Hurricane Ida.   During this period, there were multiple stabbings committed by Mize, Mark, and Pierce, which also included their second assault on Taylor.   *See* Pl. Witness List, pgs. 25-26 [doc. # 82].

11

In 2021, Taylor had "quite a bit of money" deposited in his inmate account at the TPDC, including $3,600 in COVID-19 stimulus money, together with settlement funds in the amounts of $10,000, $3,000, and $5,000.   Taylor stated that Mize, Mark, and Pierce were aware of this, and that was why they targeted him and other similarly situated inmates.

On three different occasions, Taylor talked to Warden Pat Smith, Deputy Warden Nolan Bass, and Major Johnson about his inmate account funds being taken.   In September-October 2021, Taylor asked Warden Smith, Deputy Warden Bass, and Major Warden to move him to a different dormitory or to isolation because of the threat posed by inmates, Mize, Mark, and Pierce. However, they did not do so.

Taylor was really scared on November 14, because he saw Mize, Mark, and Pierce sharpening knives and boiling water.   Taylor knew that they were getting ready to hurt him because they already had hurt his friend, "Bolock."

Taylor saw England and Washington sometime in October because he had complained about them and asked to be transferred.   He recognized them from the BCC.   Taylor knew that they were going to hurt him because Taylor had gotten them terminated from the BCC when he made a court complaint against them.

Mize, Mark, and Pierce's third and penultimate attack on Taylor occurred overnight, some time after the 5:00 p.m. shift change, the evening of November 13-14, 2021.   Taylor explained that he had no watch and, thus, had no way of telling time.   Mize, Mark, and Pierce hit Taylor on the head with a padlock attached to a belt and stabbed him in the back of his neck with a shank made by attaching a nail to a piece of wood, wrapped in toilet paper that had been wetted and then allowed to dry.

12

Taylor saw England and Washington observing the assault from outside the cellblock, but they refrained from entering the area for nine minutes.   When England and Washington finally entered, they initially sprayed Taylor with mace, while he was standing there bleeding from his neck and head and covered in blood.   As the guards entered, the other inmates scattered. England promptly punched Taylor in the eye, and Washington hit him with a can of mace before violently slamming him against a metal door.   Taylor explained that they did not have the right to treat him like that just because he was bleeding and disoriented

After the attack, the guards left Taylor in the cell for 58 days until they finally moved him to the trustee dorm for a few days before returning him to general population with the three "monsters."   Taylor remained in the cell for 58 days without being examined.   During this time, he could not even get up to use the bathroom.   No one even bothered to open the "hatch" to see if he was alive.

Taylor was not examined or treated after the attack.   As a result, the puncture wound turned to puss and his "whole body was poisoned."

Although Taylor may not have sustained any broken bones in the attack, he testified that he suffered a broken heart, a broken mind, and a cracked head.   Years later, a physician checked his head and felt the mark that is still there.   Taylor admitted that the physician wrote on his chart what he told her to write.   Taylor also acknowledged that, when he was 23, he was shot in the head and has never been the same since that time.

Taylor has several criminal convictions.   In 1993, however, he won an award for the best book cover art in Texas.

II.    **Sheena Vige**

Sheena Vige ("Vige") is Taylor's niece, the daughter of his late sister.   She has supported Taylor over the years, including financing his litigation.   Vige is the only family member left to help Taylor.

Vige called the TPDC several times on behalf of Taylor.   He was fearful of being moved in the middle of the night.   Vige talked to Sherry Whittington, who said that she would look into it.   Whittington said that she would reach out to the warden to try and get to the bottom of what was happening.   Whittington said that she was going to return Vige's call regarding Taylor's fears of physical danger and abuse.

In early August 2021, Vige spoke to Warden Pat Smith, who told her that she was going to speak to Taylor and call her back.   However, she never did.   Vige called Warden Smith four more times and left messages for her, but to no avail.   Vige was told that no one could tell Taylor how to spend his money.

Taylor broke down several times while speaking to Vige on the telephone about what was happening to him.   He told her that there were a lot of inmates being brought in and sleeping on the floor.   They were sick and he was worried why that was happening during the height of COVID-19.   Taylor also conveyed his fears to Vige about inmates, but did not provide specific names.

Taylor mentioned Washington and England to her and stated that they had been at the BCC with him previously.   However, Vige was unable to recall whether that conversation happened before or after November 2021.

Vige was out of state when Taylor was released from custody.   Therefore, she asked her

14

friend, Neil Fisher, to help Taylor.

## III.    Neil Fisher

Neil Fisher ("Fisher") assisted Taylor upon his release from prison in 2023.   If Fisher had not helped Taylor, he likely would have been rendered homeless.

Fisher did not know anything about the November 14 incident.

## IV.    Sherry Whittington

Sherry Whittington ("Whittington") is the human resources director at the TPDC and was serving in the same capacity in 2021.   She has worked at the TPDC for the past 21 years.

She did not recall ever meeting Taylor or assisting him with making four conference calls from her office.

Whittington conducts a background check on all employees.   There were no red flags on Washington's background check.   Furthermore, there were no complaints against Washington or England while they were at the facility.

Washington and England were not contract workers; they were employed by the TPDC.

Whittington authenticated the separation notices for Washington and England.   (Def. Exhs. 2-3).

Whittington stated that it was not possible for Taylor to have been hurt by Washington or England on November 14, 2021.   Furthermore, Washington and England never came back to the TPDC as deputies after they resigned (on November 4 and 1, respectively).   *See also* Def. Exhs. 2-3.

It was common for jailors to come and go for one month at a time.

The doors are kept locked at the TPDC, and, thus, Washington and England could not

15

simply return.   She conceded, however, that it was theoretically possible for the lieutenant to have unlocked the door.

## V.    Nolan Bass

Bass has worked at the TPDC for over 20 years and is now the warden.   In 2021, he was the assistant warden.   He remembered Taylor.   However, he did not recall Taylor going to his office to talk to him.   He only sees a grievance if the inmate files a request for a second step review.

Bass did not recall receiving a report from Taylor stating that he had enemies at the facility who already had hurt him.

Bass knew England before he hired him and knew that he had worked at the Madison Parish Correctional Center ("MPCC").   Bass did not know that Washington and England had worked at the BCC together.   As far as he knew, they worked at the MPCC, which was distinct from the BCC.

The TPDC interviewed England before hiring him.   Washington and England worked on the same shift together.   The pre-hire screening of Washington and England came back negative. They were not contract workers.

Bass did not recall any of the alleged incidents happening to Taylor.   If something had happened, there would have been an investigation.   If Taylor had complained about someone's actions, they would have been investigated.   Bass did not recall receiving a grievance from Taylor.

On November 14, there was a shift change at 6:00 a.m. and 6:00 p.m.   However, Washington and England were not there on that date.

16

Bass has not had any communication with Washington or England or tried to find them. He was not aware of any prior dispute between Taylor and Washington and England.

Bass stated that it is common for guards to come and go.

Bass further testified that, if a jailor leaves, they cannot simply return to the prison. Rather, they would need approval, which probably would have had to come from Bass. Bass admitted that it was possible that someone else could have let them in. However, there also would have been a log of their entrance. In short, Bass would have known if they had ever come back. They never did, however.

There was nothing in Taylor's inmate file about Washington and England. There was no documentation about Taylor being injured by these deputies. Furthermore, there was no sick call request from Taylor because of a fight with these two deputies.

## VI.    Warden Pat Smith

Smith has 32 years' experience in the corrections field. She recalled Washington, but did not recall seeing any complaints from Taylor in 2021.

She remembered Washington and England, but did not know whether they had worked at any other facility. Smith never received any complaints about Washington or England. People came and went all the time.

Smith never spoke to Whittington about Taylor's niece calling her. In fact, she had no knowledge of the allegations in the complaint.

Camera surveillance footage at the facility lasts only about one month.

Smith was unable to testify about any injuries that Taylor may have sustained at the facility.   She did not receive a request from Taylor for medical care on November 14, 2021, or anytime thereafter.

She did not know why Washington and England were not present at the trial.

## VII.    Taylor's Exhibits

Taylor submitted two exhibits that included approximately 115 pages of his medical treatment records.   (Pl. Exhs. 1-2).   The records contain Taylor's November 12, 2021 and May 22, 2022 urology appointments.   The remaining records post-date Taylor's release from custody in 2023, including radiology images of Taylor's head and spine.

## VIII.   Defendants' Exhibits

Defendants submitted into evidence a copy of Taylor's inmate file from the TPDC.   (Def. Exh. 1).   Taylor's inmate file includes his intake into the TPDC, his criminal history, a few medical treatment records, and a couple of disciplinary violations.   There were no incident reports or requests for medical treatment pertaining to any alleged physical encounters asserted by Taylor in this suit.

Defendants submitted separation notices for Washington and England that were signed by Sherry Whittington on an unspecified date.   (Def. Exhs. 2-3).   The notices indicate that both individuals were hired on October 1, 2021, and that England and Washington were separated on November 1 and 4, 2021, respectively.   *Id*.   The notices also reflect that Washington and England's employment ended because they had "quit" for "another job."   *Id*.

## <u>Conclusions of Law</u>

18

I.      **Elements of Taylor's Remaining Federal Law Claims**

a)   <u>§ 1983 General Principles</u>

Section 1983 provides that any person who, under color of state law, deprives another of "any rights, privileges or immunities secured by the Constitution and laws shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . ." *Harrington v. Harris*, 118 F.3d 359, 365 (5th Cir. 1997) (citing 42 U.S.C. § 1983).   Section 1983, however, does not create any substantive rights; it simply provides a remedy for the rights designated therein.   *Id*.   Thus, "[t]o state a claim under § 1983, a plaintiff must (1) allege a violation of rights secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law."   *Leffall v. Dallas Independent School District*, 28 F.3d 521, 525 (5th Cir. 1994).   The first inquiry is whether plaintiff has alleged a violation of a constitutional right at all.   *Id*.; *Piotrowski v. City of Houston*, 51 F.3d 512, 515 (5th Cir. 1995).

b)   <u>Excessive Force</u>

"Whenever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the *core judicial inquiry* is . . . whether force was applied in a *good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.*"   *Baldwin v. Stalder*, 137 F.3d 836, 838–39 (5th Cir. 1998) (quoting *Hudson v. McMillian,* 503 U.S. 1, 7, 112 S.Ct. 995, 999 (1992)).   Several, non-exhaustive factors are relevant to determine whether unnecessary and wanton infliction of pain was used in violation of a prisoner's Eighth Amendment right to be free from cruel and unusual punishment, including,

1. the extent of the injury suffered;

19

2. the need for the application of force;

3. the relationship between the need and the amount of force used;

4. the threat reasonably perceived by the responsible officials; and

5. any efforts made to temper the severity of a forceful response.

*Id.* (citing*, inter alia, Hudson v. McMillian,* 962 F.2d 522, 523 (5th Cir. 1992)).

c) Failure to Protect

To succeed on a § 1983 failure to protect claim, "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm" and that the prison officials acted with deliberate indifference to the inmate's safety." *Johnson v. Johnson*, 385 F.3d 503, 524 (5th Cir. 2004) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)) (internal quotation marks omitted). An official is deemed deliberately indifferent when he, "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* (quoting *Farmer*, 511 U.S. at 834). Further, "[t]he official's knowledge of the risk can be proven through circumstantial evidence, such as by showing that the risk was so obvious that the official must have known about it. *Id.* (citation omitted). Finally, the official is not liable if he "responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* (citing *Farmer*, 511 U.S. at 844).

d) Inadequate Medical Care

"A prison official violates the Eighth Amendment's prohibition against cruel and unusual punishment when his conduct demonstrates deliberate indifference to a prisoner's serious medical needs, constituting an 'unnecessary and wanton infliction of pain.'" *Delaughter v. Woodall*, 909

20

F.3d 130, 136 (5th Cir. 2018) (citations omitted).   Therefore, to establish liability for inadequate medical care under the Eighth Amendment, an inmate must adduce facts which "clearly evince" a serious medical need and the prison official's deliberate indifference to it.   *Hernandez v. Velasquez*, 522 F.3d 556, 561 (5th Cir. 2008) (citation omitted); *see also Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285 (1976).

A plaintiff must establish that a prison official "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs."   *Grogan v. Kumar*, 873 F.3d 273, 278 (5th Cir. 2017) (quoting *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006)).   A "delay in medical care can only constitute an Eighth Amendment violation if there has been deliberate indifference, which results in substantial harm."   *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993).

## II.    Elements of Taylor's Remaining State Law Claims

### a)  Battery

Under Louisiana law, a battery is a harmful or offensive contact with a person, resulting from an act intended to cause the plaintiff to suffer such a contact.   *Caudle v. Betts*, 512 So.2d 389, 391 (La. 1987).   Furthermore, "[t]he intention need not be malicious nor need it be an intention to inflict actual damage.   It is sufficient if the actor intends to inflict either a harmful or offensive contact without the other's consent."   *Id*.

### b)  Excessive Force

Under Louisiana law, excessive force claims are analyzed under a reasonableness standard similar to that used to evaluate § 1983 excessive force claims.   *Deshotels v. Marshall*, 454 Fed.

App'x. 262, 269 (5th Cir. 2011) (citing *Kyle v. City of New Orleans,* 353 So.2d 969, 972–73 (La.1977)).   Therefore, "[w]hether the force used is reasonable depends upon the totality of the facts and circumstances in each case."  *Id.* (citation omitted).

    c) Failure to Protect

An officer owes a duty to a prisoner to protect him from harm and to preserve his safety. The officer must do what is reasonable under the circumstances.  *Shivers v. Lard*, Civ. Action No. 13-2406, 2015 WL 110358, at *5 (W.D. La. Jan. 7, 2015) (citing *Brown v. Lee,* 639 So.2d 897, 898–899 (La. 1994)).

    d) Medical Care

"The duty of prison authorities to provide inmates with medical care requires that such care be reasonable."  *Fletcher v. Whittington*, Civ. Action No. 18-1153, 2022 WL 3643513, at *10–11 (W.D. La. Aug. 23, 2022) (citing *Harper v. Goodwin*, 930 So.2d 1160, 1163 (La. App. 2d Cir. 2006)).

    e) Negligence and Duty/Risk

Louisiana applies a duty-risk analysis to all tort claims.  *Fletcher*, 2022 WL 3643513, at *11 (citing *Roberts v. Benoit*, 605 So. 2d 1032, 1041–42 (La. 1991)).   To prevail on a negligence claim under Louisiana Civil Code articles 2315 and 2316, a plaintiff must prove five separate elements:

> (1) the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) the defendant failed to conform his conduct to the appropriate standard (the breach of duty element); (3) the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and (5) actual damages (the damages element).

*Shivers,* 2015 WL 110358 at *5 (citations omitted).

22

f)  Vicarious Liability

Louisiana Civil Code Article 2320 provides that, "[m]asters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed."  LA. CIV. CODE ART. 2320.   The law is clear that "an employer is liable for a tort committed by his employee if, at the time, the employee was acting within the course and scope of his employment."  *Baumeister v. Plunkett*, 673 So.2d 994, 996 (La. 1996) (citation omitted).

## III.    Burden of Proof

"An evidentiary hearing consistent with *Flowers v. Phelps* amounts to a bench trial replete with credibility determinations and findings of fact."  *Adkins v. Kaspar*, 393 F.3d 559, 563 (5th Cir. 2004) (citations and internal quotation marks omitted).   "A civil plaintiff seeking to recover damages for use of excessive force must prove his claim by a preponderance of the evidence."  *Yarrito v. Cook,* 1995 WL 17788756 (5th Cir. June 22, 1995) (unpubl.) (citation omitted).   A plaintiff must also prove his Eighth Amendment claim for inadequate medical care by a preponderance of the evidence.  *Rogers v. Hierholzer*, Civ. Action No. 16-1171, 2018 WL 6933282, at *4 (W.D. Tex. Dec. 28, 2018) (citing 5th Cir. Pattern Jury Instructions). "Preponderance" means that it is more likely so, than not so.  *Matter of Briscoe Enterprises, Ltd., II,* 994 F.2d 1160, 1164 (5th Cir. 1993) (citation omitted).   It remains within the province of the finder of fact to weigh conflicting evidence and inferences and to determine the credibility of witnesses.  *See Yarrito* 1995 WL 17788756   at *6 (citation omitted).

## Findings of Fact

I.    **Claims Against Pat Smith, Nolan Bass, and Ricky Jones**

The Court finds that Taylor failed to establish by a preponderance of the evidence that he was injured in November 2021, either by other inmates or by Defendants Washington and England.   In so finding, the undersigned acknowledges that Taylor, who, at times, became emotional at the hearing, came across as earnest and sincere in his belief that he was injured, as described.

The Court also recognizes that Taylor's niece, Vige, and her friend, Fisher, provided Taylor with needed financial and psychological support during his time in prison and upon his release.   While their testimony was credible, they did not possess firsthand knowledge of the November 2021 event at issue in the case.

Taylor testified that Washington and England were behind the November 2021 attack because they wanted to retaliate against him for his complaining about them in a prior court suit, which resulted in their termination.   As recounted earlier, Taylor did not file the *BCC Suit* until September 14, 2021, which was well after his first two encounters with England and Washington that purportedly occurred in January and March 2021.   Taylor, however, never sued England in the *BCC Suit*, nor did he assert any facts to support a claim against Washington.   *See* Dec. 7, 2021 R&R [doc. # 11] and Dec. 27, 2021 Judgment [doc. # 13] in *BCC Suit*.   Considering same, it is exceedingly unlikely that they would have been discharged or, in Washington's case, even learned that he had been sued.

Furthermore, it stands to reason that if England and Washington had injured Taylor in January, March, and November 2021, as he now claims, he would have highlighted those events

in his December 12, 2021 response to the undersigned's R&R in the *BCC Suit*.    *See* Pl.

Acceptance of R&R [doc. # 14] in the *BCC Suit*.    Inexplicably, however, Taylor acquiesced to

the R&R, without objection.    *Id*.    Certainly, the November 13 attack would have been fresh in

his mind, especially when he was purportedly still locked up in his cell without medical care or

anyone checking on him.[7]

    Taylor's account of what happened requires the Court to find either that Washington and

England did not resign their employment at the TPDC in early November, or that they later

returned to the TPDC, after their severance, with the intention to harm Taylor.    The undersigned

finds, however, that Taylor did not prove either scenario by a preponderance of the evidence.

While Taylor's testimony, on its own, theoretically could suffice to meet his burden of proof,

there simply are too many improbabilities with his account.    Ultimately, the Court finds that the

testimony of Whittington, Bass, and Smith to be more credible than that of Taylor.    Furthermore,

per Taylor's several lawsuits, he has suffered injuries to his head in the past.    Even Taylor

admitted that he has not been the same since he was shot in the head when he was younger.

    In addition, Taylor's inmate file contains no record of the alleged November 13-14

incident, and there is no indication that Taylor ever sought medical treatment for the alleged

"horrific" wounds he suffered as a result of the attack.    Again, while a coverup by Defendants is

theoretically possible, Taylor has not established that it is more likely so, than not so.

---

[7] Taylor testified that prison officials left him in the cell for 58 days after the attack.    However, if, as Taylor alleged, he was covered in blood after the attack with a wound that was oozing puss, this seems improbable.    Furthermore, if, as Taylor testified, he had been left isolated in his cell, then he would have been unable to pen and mail correspondence to the Court.    However, since Taylor clearly *did* manage to send a letter to the Court, *see* the *BCC Suit*, it is inconceivable that he would not also have mentioned the circumstances of the attack he recently had suffered in November and for which he had not received any medical attention.

In sum, the Court finds that Taylor failed to prove, by a preponderance of the evidence, that he was attacked by other inmates on or about November 13-14, 2021 or that Defendants, England and Washington, were present at the TPDC on those days.[8]   Consequently, Taylor did not prove, by a preponderance of the evidence, that Defendants, Pat Smith, Nolan Bass, and Ricky Jones failed to protect him from the phantom attack(s) in November 2021.

Finally, Sheriff Jones cannot be held vicariously liable for the actions or inaction of England and Washington, who were not present or employed by him at the time of the phantom attack(s).   *See Gomez v. Galman*, 18 F.4th 769, 781 (5th Cir. 2021) (vicarious liability attaches only if the employee is acting within the purview of his assigned duties and in furtherance of his employer's goals).

## II.    Claims against England and Washington

Having determined that Taylor failed to prove by a preponderance of the evidence that he was the victim of an attack on or about November 13-14, 2021, committed by fellow inmates or by Defendants, England and Washington, themselves, the Court necessarily finds that Taylor cannot recover against England and Washington under any theory of liability, including for failure to protect, excessive force, or failure to provide adequate medical care under federal law and analogous negligence or intentional tort claims under state law.

The Court recognizes that Defendants England and Washington presently are subject to entries of default against them.   However, "[w]hen a case involves multiple defendants, courts may not grant default judgment against one defendant if doing so would conflict with the position

---

[8] The Court has not interpreted Taylor's pleadings as asserting claims against Taylor and Washington for their alleged actions against him in January and March 2021.   Nonetheless, insofar as Taylor intended to do so, he did not prove that those incidents occurred either.

taken by another defendant." *Escalante v. Lidge*, 34 F.4th 486, 495 (5th Cir. 2022) (citation omitted).

Here, the Court is precluded from entering a default judgment against England and Washington because that would conflict with the Court's twin finding that Taylor was not attacked by other inmates on or about November 13-14, 2021 and that Defendants England and Washington were not present at the TPDC on those days.   Furthermore, where, as here, "a defending party establishes that plaintiff has no cause of action . . . this defense generally inures also to the benefit of a defaulting defendant."   *Lewis v. Lynn*, 236 F.3d 766, 768 (5th Cir. 2001) (citations omitted).[9]

A court may set aside an entry of default for good cause, *sua sponte*.   *See* FED. R. CIV. P. 55(c) and *Freilich v. Green Energy Res., Inc.*, 297 F.R.D. 277, 283 (W.D. Tex. 2014) (citations omitted).   To determine whether good cause exists to set aside a default the court should consider three factors:   "whether the default was willful, whether setting it aside would prejudice the adversary, and whether a meritorious defense is presented."   *Lacy v. Sitel Corp.*, 227 F.3d 290, 292 (5th Cir. 2000) (citations omitted).

Applying the foregoing considerations here, the undersigned finds that there is no evidence that the default was willful.   Furthermore, Taylor will not be materially prejudiced by setting aside the default against England and Washington because they have a meritorious defense as established by their co-defendants at the trial of this matter.   *See* discussion, *supra*. Accordingly, the Court finds good cause for setting aside the entry of default against England and

---

[9] The rationale for this rule is that it would be "incongruous" and "unfair" to allow some defendants to prevail, while not extending the same benefit to similarly situated defendants.   *Id*.

Washington.

## III.    Defendants' Unnamed Insurer

Having determined that Taylor failed to establish liability against any principal Defendant, he necessarily cannot recover against their unnamed insurer.    *Resolution Tr. Corp. v. Walker*, Civ. Action No. 92-430, 1994 WL 777355, at *12 (W.D. La. July 29, 1994) (citations omitted) (dismissal of claims against an insured releases its insurer from liability).

### <u>Conclusion</u>

The Court emphasizes that, as is in most all civil cases, the plaintiff has the burden of proving his case by a preponderance of the evidence.    Taylor's unsupported testimony does not persuade the Court that his version of events is more likely so than not so.    For the foregoing reasons,

IT IS RECOMMENDED that Plaintiff Robert Paul Taylor's pending motion to confirm default judgment [doc. # 88] against Defendants, Roosevelt England (sued as, "Robert England" or "R. England") and Marzavian Washington (sued as, "Corporal Washington" or "Cpl Washington"), be DENIED, and, instead, that the Clerk of Court's entries of default against said Defendants be set aside.

IT IS FURTHER RECOMMENDED that the District Court enter judgment in favor of all remaining Defendants, Sheriff Ricky Jones, Pat W. Smith, Nolan Bass, Roosevelt England (sued as, "Robert England" or "R. England"), Marzavian Washington (sued as, "Corporal Washington" or "Cpl Washington"), and their unnamed "Insurer," and against Plaintiff Robert Paul Taylor, DISMISSING, with prejudice, Plaintiff's claims, in their entirety, at his cost.    FED. R. CIV. P. 54(d)(1) and 28 U.S.C. § 1920.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule 72(b), parties aggrieved by this Recommendation have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14) days** after being served with a copy of any objections or response to the District Judge at the time of filing. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

In Chambers, at Monroe, Louisiana, on this 29th day of May, 2025.

KAYLA DYE MCCLUSKY
UNITED STATES MAGISTRATE JUDGE

29